UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

3:25-cv-2347-JDA

| | |
|---|---|
| **Sidney Coulter Benton,** ) | **Civil Action No.:_____** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **COMPLAINT** |
| ) | **JURY TRIAL DEMANDED** |
| **National Credit Systems, Inc.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## **COMPLAINT**

1.  This is an action brought by Plaintiff, Sidney Coulter Benton, for actual, statutory, and punitive damages, attorneys' fees, and costs for Defendant National Credit Systems Inc.'s (hereinafter "NCS") violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq, (hereinafter "FCRA"), and compensatory and punitive damages for the Defendant's violations of the South Carolina common law set forth herein.

2.  The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3.  Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

1

4. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

5. This Court has Jurisdiction under the FCRA, 15 U.S.C. §1681p, and 28 U.S.C. §1331 and §1332.

6. Venue is proper in the Columbia Division because the Plaintiff resides in Richland County and the Defendant transacted business throughout South Carolina and in this division.

## PARTIES

7. Plaintiff, Sidney Coulter Benton, is a resident and citizen of the State of South Carolina, Richland County, and is over the age of twenty-one (21) years. Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

8. Defendant NCS is a Georgia corporation with its principal office located at 1775 The Exchange SE, Suite 300, Atlanta, Georgia 30339. NCS may be served with process

by way of its Registered Agent, C T Corporation System, 2 Office Park Court Suite 103, Columbia, South Carolina 29223. In all respects and at all times relevant herein, Defendant was doing business in the State of South Carolina and in this division.

## FACTUAL ALLEGATIONS

9. On or about March 26, 2023, Plaintiff received an alert from Credit Karma of a new collection account being reported on her credit reports. The collection account was reported by NCS for an unpaid balance with Polo Village Apartments located at 1270 Polo Road in Columbia, South Carolina, in the amount of $7,509.00.

10. Plaintiff has never resided at Polo Village Apartments. When Plaintiff received the Credit Karma notification in March of 2023, she was living at an address on Forest Drive in Columbia, and had been living at that address for at least three years prior to the receipt of the notification.

11. Plaintiff contacted Polo Village Apartments (hereinafter "Polo Village") and informed the rental office that she had never resided there. Office personnel informed Plaintiff the charges were for past due rent and for the poor condition of the apartment once vacated. Plaintiff again stated she never resided at Polo Village. The office employee then informed Plaintiff they had "her" rental application and provided Plaintiff with the email address they had on file. The email address provided was similar to Plaintiff's email address, but it was not Plaintiff's. Plaintiff again specifically informed Polo Village that someone was impersonating her, as she had never lived there.

12. On or about April 5, 2023, Plaintiff went to the City of Forest Acres Police Department and filed an Incident Report stating that an unknown individual had

3

impersonated her and obtained an apartment in her name at the Polo Village. The incident report was thereupon forwarded to the Richland County Sheriff's Department due to the offense occurring outside of the city limits for Forest Acres.

13.     On or about April 6, 2023, Plaintiff filed an Identity Theft Report with the Federal Trade Commission.

14.     On or about April 6, 2023, Plaintiff sent a letter to Defendant, the collection agency seeking to collect the debt for Polo Village, wherein she informed Defendant she had been the victim of identity theft and that an identity thief had used her personal information without her permission to rent an apartment with Polo Village. With the letter, Plaintiff included a copy of her driver's license and a copy of the FTC Identity Theft Report she had completed.

15.     In early Summer 2023, Plaintiff wanted to move from her current residence of the past three years. Plaintiff applied for residency at Tapestry Tyvola, an apartment complex in Charlotte, North Carolina.

16.     On or about June 22, 2023, Plaintiff received an Adverse Action Letter via email from Jenny Kim, the Assistant Community Manager of Tapestry Tyvola, thanking her for her recent application to Tapestry Tyvola, but informing Plaintiff that "[a]t this time, we are unable to approve your application." The email went on to say the decision was based on information contained in a consumer report obtained from SafeRent Solutions, LLC, and provided an address and phone number where SafeRent Solutions could be reached.

17.     Plaintiff responded to Jenny Kim's June 22, 2023 email asking if she were able to provide any details on the reason for the denial. Ms. Kim responded to Plaintiff stating

the decision was based on Tapestry Tyvola's third-party screening company, SafeRent's recommendation to deny Plaintiff's application.

18. On or about June 22, 2023, Plaintiff obtained copies of her credit reports from Equifax, Experian, and TransUnion through annualcreditreport.com. When Plaintiff reviewed the reports, she discovered that Defendant was reporting a collection account based on the fraudulent lease with Polo Village.

19. On or about June 26, 2023, Plaintiff received a copy of SafeRent's report, which specifically stated it was a reseller of credit information received from Experian. The SafeRent report also contained the NCS collection account.

20. On or about June 30, 2023, Plaintiff sent a dispute letter to SafeRent **("First SafeRent Dispute")** in which she disputed the NCS collection account xxxxx94 (hereinafter the "Account" or "NCS Account") as incorrectly reporting on the SafeRent consumer report. Plaintiff told SafeRent it was not her Account, and that the NCS Account was fraudulent as she had never lived at Polo Village. SafeRent received Plaintiff's First Dispute on or about July 18, 2023.

21. On or about June 30, 2023, Plaintiff sent a dispute letter to Equifax **("First Equifax Dispute")** in which she specifically disputed the NCS Account, with an unpaid balance of $7,509, as not her account as she had never lived at Polo Village. Equifax received Plaintiff's First Dispute on or about July 12, 2023, and thereafter forwarded same to Defendant.

22. On or about June 30, 2023, Plaintiff sent a dispute letter to Experian **("First Experian Dispute")** disputing the NCS Account, with an unpaid balance of $7,509, as not

5

her account as she had never lived at Polo Village. Plaintiff also disputed two inquiries by Resident Verify as they were made on behalf of Polo Village. Experian received Plaintiff's First Dispute on or about July 11, 2023, and thereafter forwarded same to Defendant.

23. On or about June 30, 2023, Plaintiff sent a dispute letter to TransUnion **("First TransUnion Dispute")** disputing the NCS Account, with an unpaid balance of $7,509, as not her account as she had never lived at Polo Village. On or about July 12, 2023, TransUnion received Plaintiff's First Dispute, and thereafter forwarded same to Defendant.

24. On or about July 18, 2023, Plaintiff received a letter from Equifax stating it was unable to locate a credit file in its database with the identification information Plaintiff provided and requested additional documents to verify her identity and current address.

25. On or about July 20, 2023, SafeRent sent Plaintiff the results of its investigation into her dispute, which showed that Experian investigated the dispute and Defendant verified the Account as accurate. Accordingly, the Account continued to be included by SafeRent.

26. On or about July 28, 2023, Plaintiff received the results of Experian's investigation into her dispute of the Account, which showed that Defendant again verified the disputed Account as accurate. Accordingly, the Account continued to be reported on Plaintiff's Experian credit report.

27. On or about August 1, 2023, Plaintiff received the results of TransUnion's investigation into her disputes showing Defendant verified the disputed Account as accurate. As a result, the Account continued to be reported on Plaintiff's TransUnion credit report.

28. On or about August 16, 2023, Plaintiff returned a copy of Equifax's July 18, 2023,

letter with her telephone number listed thereon, as well as a copy of her Social Security Card and a copy of her most recent paystub, via certified mail. Equifax received this information on August 19, 2023.

29. On or about August 30, 2023, Plaintiff sent a second dispute letter to SafeRent **("Second SafeRent Dispute")** in which she stated she had received the investigation results and that information was continuing to be reporting incorrectly. Specifically, Plaintiff disputed the reporting of the Account as a fraud account and stated she had never lived at Polo Village. Additionally, Plaintiff disputed multiple addresses being reported that were not hers. Plaintiff also disputed inquiries made by Resident Verify as fraudulent as they were on behalf of Polo Village. SafeRent received this dispute on September 20, 2023, and thereafter it was forwarded through Experian to Defendant.

30. On or about August 30, 2023, Plaintiff sent a second dispute letter to Experian **("Second Experian Dispute")** in which she again disputed the Account as not her account as she had never lived at Polo Village. Plaintiff also disputed five addresses being reported at which she had never lived and inquiries by Resident Verify which were made on behalf of Polo Village. Plaintiff also provided her full social security number, date of birth, and address. Experian received Plaintiff's Second Dispute on September 5, 2023, and thereafter forwarded same to Defendant.

31. On or about August 30, 2023, Plaintiff sent a second dispute letter to TransUnion **("Second TransUnion Dispute")** in which she again disputed the Account as not her account. TransUnion received Plaintiff's Second Dispute on September 5, 2023.

32. On September 11, 2023, TransUnion sent Plaintiff a letter stating it was in the

process of investigating Plaintiff's dispute, but needed to verify Plaintiff's address before it could mail anything to Plaintiff. Specifically, TransUnion requested that Plaintiff provide them two forms of identification, which Plaintiff provided.

33. On or about September 11, 2023, Plaintiff sent a second dispute letter to Equifax. **("Second Equifax Dispute")** With her Second Equifax Dispute, Plaintiff again provided a copy of her Social Security card, paystub, and a copy of Equifax's August 20, 2023 letter. Plaintiff again disputed the Account, which was still reporting an unpaid balance of $7,509, as not her account as she had never lived at Polo Village. Equifax received Plaintiff's Second Equifax Dispute on September 30, 2023, and thereafter forwarded same to Defendant.

34. On or about September 11, 2023, Plaintiff received a letter from TransUnion stating that it had received her dispute regarding the Account. However, because Defendant had already verified the Account as accurate, TransUnion would not reinvestigate the Account unless Plaintiff provided additional documentation to support her dispute.

35. On or about September 21, 2023, SafeRent sent Plaintiff the results of its reinvestigation of her disputes, wherein SafeRent deleted one address disputed by Plaintiff.

36. On or about September 28, 2023, Plaintiff received the results of Experian's investigation into her Second Dispute showing the Account was verified by Defendant as accurate and therefore, the Account continued to be reported on Plaintiff's Experian credit report.

37. On or about October 8, 2023, Plaintiff received the results of Equifax's reinvestigation into her Second Dispute showing that Defendant had verified the Account

as accurate and thus, the Account continued to be reported on Plaintiff's Equifax credit report.

38. On or about November 3, 2023, Plaintiff sent a dispute letter directly to Defendant wherein Plaintiff stated that the Account for Polo Village was a fraud account and that she had never lived at Polo Village. Plaintiff requested Defendant to send her a complete copy of all documents regarding the Account, and asked Defendant to stop reporting the fraudulent account as it was harming her credit and preventing her from being able to rent an apartment.

39. Defendant received Plaintiff's dispute on or about November 6, 2023, but never responded to Plaintiff's letter.

40. On or about December 15, 2023 Plaintiff was denied her application for a bigger apartment within the same complex she was living in. As a result, Plaintiff was not able to get the apartment she desired in her name.

41. On or about January 8, 2024, Plaintiff sent a third dispute letter to Equifax **("Third Equifax Dispute")** again disputing the reporting of the Account, a collection account for Polo Village with an unpaid balance of $7,509, as not her account. Plaintiff informed Equifax she had never lived at Polo Village and that the reported Account was not her account. With her Third Dispute letter, Plaintiff enclosed a copy of the police report she filed. Equifax received Plaintiff's Third Dispute on January 11, 2024, and thereafter forwarded same to Defendant.

42. On or about January 8, 2024, Plaintiff sent a third dispute letter to Experian **("Third Experian Dispute")** again disputing the reporting of the Account, a collection account for

Polo Village, as not her account as she had never lived at Polo Village. Plaintiff also requested Experian to send her a copy of each and every document Experian received from Defendant in order to make the determination to keep the Account on her credit file. Plaintiff provided her full social security number, date of birth, and address. Experian received Plaintiff's Third Dispute on January 11, 2024, and thereafter forwarded same to Defendant.

43. On or about January 8, 2024, Plaintiff sent a third dispute letter to TransUnion **("Third TransUnion Dispute")** in which she again disputed the Account for Polo Village, with an unpaid balance of $7,509, as not hers. In support of her dispute, Plaintiff attached a copy of the police report she filed regarding the fraud. Finally, Plaintiff requested that TransUnion provide her copies of each and every document it received from Defendant in order to keep the Account on her credit report. TransUnion received Plaintiff's Third Dispute on January 11, 2024, and forwarded same to Defendant.

44. On or about January 15, 2024, Plaintiff received a letter from Equifax stating it would not be blocking the Account information Plaintiff requested be blocked on her credit file.

45. On or about February 7, 2024, Plaintiff received the results of TransUnion's investigation into her Third Dispute. The Account was again verified as accurate by Defendant. Accordingly, the Account continued to be reported as belonging to Plaintiff on her TransUnion credit report.

46. On or about February 28, 2024, Plaintiff sent a fourth dispute letter to TransUnion **("Fourth TransUnion Dispute")** in which she disputed the Account for Polo Village, with

10

an unpaid balance of $7,509, as not hers. In support of her dispute, Plaintiff attached a copy of the police report she filed regarding the fraud. Plaintiff requested that TransUnion provide her copies of each and every document it received in order to keep the Account on her credit report. TransUnion received Plaintiff's Fourth Dispute on March 4, 2024, and thereafter forwarded same to Defendant.

47. On or about February 29, 2024, Plaintiff received a copy of her TransUnion credit report. Finally, after almost a year, the Account was no longer reporting on her TransUnion credit report.

48. On or about June 13, 2024, Plaintiff received a copy of her TransUnion credit report and verified the Account was not reporting on her TransUnion credit report.

49. In November of 2024, Plaintiff got a new job in Charlotte and had to relocate. Therefore, on or about November 19, 2024, Plaintiff applied for an apartment at Madison Farms, but was once again denied housing due to the reporting of the Account appearing on Plaintiff's Experian credit report.

50. To date, despite receiving at least nine ACDVs from the credit reporting agencies, two direct disputes and multiples copies of Plaintiff's police report and FTC Affidavit, the Defendant continues to incorrectly report the fraudulent Account as belonging to Plaintiff.

51. Defendant failed to make a reasonable investigation into Plaintiff's disputes from the credit reporting agencies.

**COUNT ONE**
**(Violation of the Fair Credit Reporting Act)**

52. Plaintiff hereby adopts all of the allegations set forth in paragraphs 9 through 51 as

if set forth fully herein.

53. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the information said Defendant had provided to a consumer reporting agency.

54. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

55. Defendant negligently violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by the Defendant to the consumer reporting agencies.

56. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(c) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agencies.

57. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the accounts the subject of this action was inaccurate, incomplete, false, and misleading.

58. As a result of Defendant's violations set forth above, the Plaintiff suffered damage to her credit and credit reputation, her credit scores dropped significantly, she lost credit opportunities, and she was unable to get a new apartment. Additionally, Plaintiff suffered humiliation, anxiety, loss of sleep, anger, worry, physical pain and illness, loss of enjoyment of life, and mental anguish, as well as damages for attorney fees, certified mail expenses, and other out-of-pocket losses.

## COUNT TWO
### (Violation of the Fair Credit Reporting Act)

59. Plaintiff hereby adopts all of the allegations set forth in paragraphs 9 through 58 as if set forth fully herein.

60. Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the information said Defendant had provided to a consumer reporting agency.

61. Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

62. Defendant willfully violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by the Defendant to the consumer reporting agencies.

63. Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(c) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agencies.

64. Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the accounts the subject of this action was inaccurate, incomplete, false, and misleading.

65. As a result of Defendant's violations set forth above, the Plaintiff suffered damage to her credit and credit reputation, her credit scores dropped significantly, she lost credit opportunities, and she was unable to get a new apartment. Additionally, Plaintiff suffered humiliation, anxiety, loss of sleep, anger, worry, physical pain and illness, loss of

enjoyment of life, and mental anguish, as well as damages for attorney fees, certified mail expenses, and other out-of-pocket losses.

## COUNT THREE
### (Defamation, Libel and Slander)

66. The Plaintiff adopts the averments and allegations of paragraphs 9 through 65 hereinbefore as if fully set forth herein.

67. Defendant willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large. Said statements harmed Plaintiff's reputation and caused Plaintiff to suffer severe damages, including being denied an apartment, and suffering collection efforts by Defendant.

68. Said communications were false in that Plaintiff was not indebted to Defendant. Plaintiff did not owe any balance on the Account that is the subject of this action as both were clearly fraudulent accounts.

69. Said false and defamatory statements have harmed the reputation of Plaintiff and/or deterred third persons from associating with Plaintiff. Specifically, Polo Village referred the Account to Defendant who subsequently undertook to collect the Account and reported said Account as a collection account on Plaintiff's credit files. Plaintiff's credit files were viewed by numerous third parties such as, Affirm, Bayview Solutions, Inc., Calrity/Credit Ninja, FADV, First Advantage/Resident Data, JPMCB Card, LexisNexis/State Farm, LN/Allstate Insurance Co., LN/Liberty Mutual Insura, Navy Federal Cr Union, and Progressive Insurance.

70. Defendant communicated to third parties and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including but not limited to reporting that Plaintiff owed the Account that is the subject of this action.

71. At the time said communications were made, Defendant knew or should have known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully and maliciously communicated the falsity.

72. As a result of the intentional communications to the third parties of the false information, Plaintiff was caused to suffer injury to her reputation in the eyes of her community and the public at large and was forced to endure credit reporting of the Account, in spite of the fact that Plaintiff did not owe the Account, as said Account was fraudulently opened in her name.

73. As a proximate consequence of said defamation, libel and slander, Plaintiff was caused to endure collection activities and harassment by NCS, to have negative credit reports, to be held up to public ridicule or shame, to be denied apartments on at least three occasions, and made to suffer humiliation, anxiety, loss of sleep, anger, fright, physical sickness, loss of enjoyment of life, and mental anguish for which she claims compensatory and punitive damages.

## AMOUNT OF DAMAGES DEMANDED

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendant for the following:

A. Actual and statutory damages from Defendant pursuant to 15 U.S.C.

§1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1);

B.  Punitive damages from Defendant pursuant to 15 U.S.C. §1681n(a)(2);

C.  Costs and reasonable attorneys' fees from Defendant pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2);

D.  For compensatory and punitive damages in an amount to be determined by a struck jury for Defendant's defamation, libel and slander;

E.  For this trial to be heard by a jury; and

F.  For all such other and further relief as the Court may deem just and proper.

*/s/ Penny Hays Cauley*
Penny Hays Cauley, Fed. ID No. 10323
Attorney for Plaintiff

**OF COUNSEL:**
HAYS CAULEY, P.C.
1303 West Evans Street
Florence, SC 29501
(843) 665-1717
(843) 665-1718 Facsimile
phc917@hayscauley.com

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

*/s/ Penny Hays Cauley*
Of Counsel

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL:**

National Credit Systems, Inc.
c/o C T Corporation System – Registered Agent
2 Office Park Court, Suite 103
Columbia, South Carolina 29223

16